**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MELISSA A. BUCHANAN, | ) | CASE NO. 1:23-CV-00096-JRA |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL SECURITY, | ) | CARMEN E. HENDERSON |
| | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant, | ) | |

## I. Introduction

Plaintiff, Melissa Buchanan ("Buchanan" or "Claimant"), seeks judicial review of the final decision of the Commissioner of Social Security finding she was no longer disabled. This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b). For the reasons set forth below, it is RECOMMENDED that the Court OVERRULE Claimant's Statement of Errors and AFFIRM the Commissioner's decision.

## II. Procedural History

On October 23, 2013, it was determined that Claimant was disabled and had been since April 14, 2011.  (ECF No. 7, PageID #: 823).  However, on May 14, 2018, the Social Security Administration determined that Claimant was no longer disabled.  (*Id.*)  This determination was upheld on reconsideration, and Claimant requested a hearing before an administrative law judge ("ALJ").  (*Id.*).  The ALJ issued an unfavorable decision on August 7, 2019, and Claimant

appealed the decision to the United States District Court for the Northern District of Ohio. (*Id.*). The District Court remanded the case on May 3, 2021. (*Id.*)

Following remand, the Appeals Council directed the ALJ to offer Claimant an opportunity for a new hearing and to develop the administrative record to include relevant files from the prior proceeding. (*Id.*). On August 8, 2022, the ALJ held a hearing, during which Claimant, represented by counsel, and an impartial vocational expert testified. (*Id.*). On October 4, 2022, the ALJ issued a written decision finding Claimant was no longer disabled. (*Id.*).

On January 18, 2023, Claimant filed her Complaint to challenge the Commissioner's final decision. (ECF No. 1.) The parties have completed briefing in this case. (ECF Nos. 8, 12, 13). Claimant asserts the following assignments of error:

> (1) The ALJ failed to meet her burden of proof that there was medical improvement in Ms. Buchanan's mental health and that her disability ceased on May 14, 2019.

> (2) The ALJ found at Steps IV and V that Ms. Buchanan had the residual functional capacity to perform work at all exertional levels except she can understand, remember, and apply information to complete simple and detailed instructions; can perform duties in a work environment that does not require piece rate type work; can interact with others up to occasionally to engage in work related tasks such as asking questions, gathering information, clarifying instructions, pointing or directing where items may be placed but no arbitration or conflict resolution; and can adapt to routine type changes in the work place setting. This finding lacks the support of substantial evidence because the ALJ failed to base that determination on the record as a whole and failed to explain the basis for that conclusion.

(ECF No. 8 at 1).

### III. Background

#### A. Relevant Hearing Testimony

The ALJ summarized the relevant testimony from Claimant's hearing:

> The claimant reported that she is easily overwhelmed and distracted; and noted that she lacks self-motivation (hearing testimony). She also stated that she gets

2

stressed out and nervous around supervisors in work environments and becomes overwhelmed with work tasks, explaining she cannot focus or concentrate and does not know where to begin in tackling a task (hearing testimony). She also testified that she does not work well with others and reported that she feels people "brush [her] off" and just do not want to be around her (hearing testimony). The claimant testified that she finds her home environment much more relaxing than having to work under time and pressure demands in a work-environment with a supervisor watching her (hearing testimony). The claimant reported that she takes medications for anxiety including Latuda and Depakote, which she acknowledged, have helped her to function in a way that she has not needed additional inpatient care since 2013 (hearing testimony). The claimant also reported difficulty remembering, completing tasks, concentrating, understanding, following instructions, and getting along with others (B12E/6). She reported that she could pay attention for only a few minutes at a time and stated she is "terrible" with written and spoken instructions (B12E/6; hearing testimony). In August 2022, the claimant testified that she continues to take her prescribed medication but reported that it is not really helping her too much despite constant adjustments (hearing testimony).

At the hearing in August 2022, the claimant testified that she spends most of her time at home where she lives with her boyfriend/fiancé of 20 years, and their children – an 18-year old daughter and a 5-year old son (hearing testimony). The claimant testified that prior to becoming pregnant, she conducted her own research to determine whether it was safe to change her medication to Latuda so she could get pregnant and not harm the unborn child. She reported that she gets assistance with activities of daily living from her older daughter and her partner/fiancé whenever she feels overwhelmed. She reported that her partner is not currently working (as of August 2022) because she needs him to help with her activities of daily living and help guide her through her day (hearing testimony). The claimant also reported that in addition to her partner and adult daughter, her support system includes her mother, mother-in-law, and best friend (hearing testimony). The claimant reported that on good days she is able to attend to and care for her young son for a couple hours and on a bad day she becomes overwhelmed and unable to focus. The claimant stated that her fiancé and her daughter take her grocery shopping – stating she never goes on her own – and her fiancé does the cooking for them (hearing testimony). She reported that she only leaves her home about twice per week, and stated that she only drives about once per month because she gets too anxious and has her husband or daughter give her rides if she needs to go somewhere (hearing testimony).

(ECF No. 7, PageID #: 831-32).

**B.  Relevant Medical Evidence**

The ALJ also summarized Claimant's health records and symptoms:

3

The records show that in August 2007, the claimant reported her current medications were helping with depression and manic moods, and she reported good control, was sleeping well, with normal appetite, and good concentration and energy levels (B1F/2-4). Notes indicate she did not have mood swings, grandiose thinking, or any psychosis with medication compliance (B1F/2). She reported decreased anxiety with the recent addition of Lamictal to the medication regimen, but reported getting anxious in public settings with crowds and feeling as though people stare at her – a feeling she has always experienced (B1F/2). The claimant reported having three instances of hospitalization after having a baby (2 years prior), twice for manic episodes and once for depression (B1F/2). There was no history noted of substance use and no legal problems, and no other pertinent medical conditions were noted (B1F/2-3). At that time, mental status exam findings noted she appeared pleasant and cooperative, with good eye contact, clear speech, and no suicidal or homicidal ideation; no flight of ideas or grandiose thinking; she reported good mood; demonstrated full range of affect; and had good fund of knowledge (B1F/4).

The claimant continued treatment with medication management services and counseling through the Far West Center from 2008-2013 (B1F; B2F; B4F/16-48). Records from February and May 2013 noted the claimant was able to function with daily life but reported difficulty functioning on the job and was having trouble working with people, and stated that work activity was overwhelming and she could not function (B2F/17-19; B4F/20-22). She also expressed a desire to become pregnant, but was advised she should not become pregnant on her current medications for her mental impairments (B2F/19; B4F/20-22). In August 2013, the claimant reported an increase in symptoms and experiencing a manic episode after admitting she forgot to take three doses of lithium (B2F/13; B4F/16).

At the comparison point decision – October 23, 2013 – the claimant had been receiving outpatient treatment for some time for mental health impairments (B1F; B2F; B4F). Notably, in August 2013, she was hospitalized for over two weeks for severe mania, including pacing, racing thoughts, pressured and rapid speech, and reports of visual hallucinations (B1F/19-23; B3F/6- 24). Treatment records show she was admitted on August 11, 2013 with significant depression and mixture of hypomanic symptoms (B3F/6). She needed adjustment of her medications, and after adjustments were made, she started feeling better, was less labile, was more cooperative, was sleeping much better, and her family was notably impressed with her progress and improvement (B3F/6). She was discharged in stable condition on August 27, 2013 with a plan/instruction to follow up with a psychiatrist and adjustments to her prescribed medications (B3F/6). After the hospitalization, treatment records indicate she was quite dependent on her husband; she had decreased concentration and attention; and avoided people due to her paranoia. She also needed reminders to perform personal care; was only able to perform limited household chores; and her energy levels were decreased (B2F/8-12; B4F/12-15).

4

The claimant continued to follow up for medication management services with notes indicating some adjustments with reports of ongoing anxiety and bipolar symptoms (B2F; B4F). However, the records also note that while she appeared anxious at times, she was "overall stable in terms of mood" as of May 2016, at which time she was also six weeks pregnant and her medication had been switched to Latuda (B4F/1-2). The claimant testified at the hearing that she conducted her own research to determine whether Latuda was safe for her to take while pregnant. She concluded it was safe for her to use.

The records show the claimant did not have further or additional deterioration requiring inpatient psychiatric hospitalization since August 2013 (B4F/2). The records also show the claimant delivered a healthy baby in September 2017, at which time she reported that she was good about taking her Latuda to manage bipolar disorder and reported to providers that "the medication has managed her symptoms well" (B6F/10-15). Although the claimant admitted to anxiety and getting overwhelmed easily, she also stated she had a good support system to help her and a good physician team to manage her mental health symptoms (B6F/15). At post-partum follow up appointments, the claimant did not report complaint and there were no signs or symptoms of post-partum depression. (B6F/3-5).

In April 2018, the claimant underwent a consultative psychological evaluation, during which she complained of bipolar disorder and anxiety (5F/2). She described herself as overwhelmed and endorsed additional symptoms including difficulty sleeping, mania, rapid thinking, rapid speech, crying spells, depression, irritability, and agitation (B5F/5). She also reported compliance with prescribed medication, including Latuda, and explained she liked this medication the most (B5F/5). Mental status examination findings noted the claimant appeared well groomed, cooperative, and related well with the examiner (B5F). The examiner noted her speech was rapid and mildly intrusive, but controlled; her responses were direct and relevant; her thinking was well organized; and she showed appropriate affective expression with a good range of affect (B5F). The claimant reported that her boyfriend assists her with caring for their baby, and she also reported that her older daughter helps around the house with household chores (B5F/6). The claimant reported being easily distracted and claimed she did not finish tasks/projects that she starts (B5F/6). She described herself as nervous and anxious, but denied any significant hallucinatory experiences and denied suicidal/homicidal ideation (B5F/6). During the examination, the claimant appeared alert and in good contact with reality; was well oriented to time and place with correct knowledge of the year, date, month, location, and nature of the office (B5F/6). She was able to count backwards from 20 to 1 in 18 seconds, say the alphabet in 10 seconds, and count from 1 to 40 by threes in 16 seconds, all with no error (B5F). On digit span testing, she was able to remember six digits forward and three backward; and her insight and judgement appeared to be good (B5F). The claimant reported daily activities including taking care of her baby, cleaning, cooking, watching videos online, reading on the internet, and listening to music (B5F/7). She also reported that she helps with household chores

including cooking meals, washing dishes, and grocery shopping (B5F/7). At that time, the consultative examiner, Ronald Smith, Ph.D., diagnosed the claimant with bipolar II disorder, current episode hypomanic, mild, in partial remission (B5F).

Treatment records after the consultative examination note the claimant's complaints of continued anxiety, but also note she expressed a desire to work (B8F/5). Mental status examination findings indicate she appeared anxious, but also exhibited moderate awareness and judgment, full orientation, and alert consciousness (B8F/5). Additional treatment records note the claimant admitted her medication was helpful for her social anxiety (B9F/7; B14F; B15F; B16F; B20F; B22F). Examination findings revealed the claimant displayed appropriate mood and affect, intact orientation, and normal insight and judgment (B9F/6, 10; B15F/4-26). By May and August 2018, the treatment records indicate the claimant was "stable" on medications (B9F/2, 7- 10).

(ECF No. 7, PageID #: 828-30).

The ALJ discussed additional medical evidence later in her decision:

At a follow up appointment on June 13, 2018, the claimant and her fiancé appeared with concerns including a notification from Social Security as well as adjustments to her medications (B14F). The progress notes indicate that "although Latuda has stabilized her mania and she has been out of the hospital for the past five years, she becomes extremely irritable and this has increased since off Depokote prior to pregnancy" (B14F/1). The notes also indicate the claimant's fiancé believed the Depokote helped the claimant's irritability, but the claimant was not eager to go back on it because she felt "zombified" on it (B14F/1). Mental exam findings noted the claimant reported irritable mood and reported ok motivation energy, but stated she had difficulty managing basics plus an infant and felt anxious and overwhelmed; but her thought process was linear, her affect was within normal limits at the appointment, her memory was adequate, socialization was within normal limits, speech was clear, judgment and insight were fair, self care/ADLs were good, and she report no complaints with regard to sleep (B14F/1-2). Her medications were adjusted at that time with instruction to take Depakote 250mg one QHS for 2 weeks and if irritability continued, then take 500mg QHS, and Buspar 10mg one BID was also added (B14F/2). When she followed up one month later in July 2018, progress notes indicate the claimant reported feeling "fine" and her mood was much more even with improvement in mood swings, and anxiety was "under better control" (B14F/3, 7). The mental status exam findings noted she was cooperative; her mood, affect, memory, self-care/ADLs, and sleep were within normal limits; motivation/energy was fair; insight and judgment were fair; socialization was fair; and her anxiety was noted to be improved (B14F/3-4, 7-8). She was continued on her medication regimen (B14F/3). Subsequent record noted the claimant reported her medications were working well for anxiety and bipolar disorder, and while records noted she

presented with anxious/fearful thoughts and depressed mood, the psychiatric portion of the physical exam notes indicate she presented with appropriate mood and affect, normal insight, and normal judgment (B15F/18, 20, 22-26). In November 2018, the claimant again reported her medications were "working well" (B15F/22).

Treatment records show the claimant reached out with a request to be linked to individual counseling through Nord Center in December 2018 (B16F/1-9, 21). The treatment records for the initial assessment in December 2018 with the Nord Center indicate the claimant presented on self-referral (though the claimant denied the self-referral nature at the hearing), presented with her one-year old son at the assessment, and reported experiencing anxiety on a daily basis all her life, social anxiety, and depressive episodes for many years as well as intermittent manic episodes (B16F/1-10). She reported having some limitations with personal hygiene, grooming, completing housework, shopping, and managing finances due to depression and anxiety (B16F/5-6). She reported that when off her medications she experiences low energy, diminished interest, and worthlessness, but also reported her depressive symptoms had decreased due to her current medication regime as of December 2018 (B16F/6). She also reported having experienced manic episodes in the past with increased energy and decreased sleep, but reported that as of December 2018, her last manic episode occurred about 14 months prior (B16F/7). The assessment noted she appeared alert and oriented with anxious mood and constricted affect; presented with racing speech and thoughts; but was cooperative throughout the assessment, denied suicidal or homicidal ideation, and no psychosis was reported or observed (B16F/8-10). The assessment noted the claimant's symptoms caused clinically significant impairment and in accordance with DSM 5, the claimant was given a diagnosis of Generalized Anxiety Disorder (B16F/9-10). It was recommended she follow up with individual counseling to address mental health symptoms as well continuing medication management services (B16F/10).

Follow up treatment records note her reports of feeling and appearing anxious, but also note that her progress was good, she appeared with logical thought processes and was oriented; she denied side effects from medication, denied suicidal/homicidal ideation, denied audio or visual hallucinations, and had no inpatient treatment since 2013 (B16F/1-10). One treatment note states the claimant reported experiencing hallucinations "when on medications" but this was the first time such symptoms were mentioned, and additional records note she denied having any side effects and denied experiencing hallucinations. The records demonstrate the claimant's lengthy history of treatment and show her consistent follow up for medication management, therapy, and counseling to help manage her conditions with a lengthy period of stability with no hospitalizations since 2013. . . .

In December 2018, at the next medication management follow up appointment, the claimant appeared with her 15 month old son, and reported she continued to

get irritable and asked about a trial of Vraylar (B14F/5). She also reported that she does not always eat with Latuda out of fear of gaining weight, and was encouraged to take food with her medication to enhance its effectiveness (B14F/5). The claimant's dosage of Buspar was also increased after she reported feeling anxiety had not significantly improved (B14F/5-6). She reported continued irritability, but also acknowledged that Latuda had "made a significant difference" with her mood stability (B14F/5). Exam findings indicate she appeared cooperative with only some instability of mood, and her memory, orientation, affect, socialization, motivation/energy, judgment/insight, and self care/activities of daily living were found to be within normal limits (B14F/5-6).

Psychiatric findings from January 2019 were absent significant abnormality (B15F/16). Additionally, the records indicate the claimant reported she donated plasma twice per week, but had not been able to due to being out of anxiety propranolol medication in January 2019, explaining she gets increased anxiety around others despite not being tachycardic in the doctor's office, and a refill was provided (B15F/12). In early January 2019, the claimant reported to a different provider she felt her medications were not working as well as they should be, and indicated her intent to transfer her treatment services to the Nord Center (B16F/21-23). The treatment records also note that when claimant appeared for counseling January 18, 2019 she had concerns about her medication, but also admitted that it has helped her (B16F/23). The counseling records noted that she "appears to very devoted to her baby boy" and indicated "[s]he wishes her daughter and Michael (father of the children) would be more helpful" (B16F/23). Good progress was noted toward her treatment goals (B16F/23). Progress notes from a group therapy session on February 1, 2019 noted the claimant reported maintaining her responsibilities within the home and stated she was often caring for the baby and "cooks two times a week" (B16F/25). In March 2019, the claimant exhibited anxious mood, but maintained cooperative behavior/functioning, logical thought process, and proper orientation, and her progress was noted to be "good" (B16F/19).

The claimant continued to follow up with recommended treatment including attending group therapy and counseling as well as medication management (B16F; B18F). Progress notes indicate she followed up with group therapy sessions through the Nord Center and was actively committed to her treatment process (B16F/15). Treatment records noted she demonstrated good progress and though she appeared with anxious mood/affect, she was cooperative and showed logical thought processes (B16F/19). In February 2019, the progress notes indicate the claimant "nervously spoke throughout her entire visit" but she also reported feeling a decrease in anxiety from the medication adjustments, reporting an initial increase in anxiety, but then had calming effects (B14F/9-10). The claimant also reported she was considering her medication management services to Nord because she "wants all [her] care under one roof" and her counselor was at Nord (B14F/9-10). In April 2019, the claimant answered "Not at all" when asked how often she had "little interest or pleasure in doing things" or "feeling

down, depressed or hopeless" (B15F/7). Additionally, treatment records noted she presented with anxious/fearful thoughts but denied depressed mood, difficulty falling asleep or difficulty staying asleep; and though she reported feeling that the Buspar made her anxiety worse, physical exam findings noted she appeared with appropriate mood and affect, and had normal insight and judgment (B15F/6-10). She also reported her medications were working well and that she used propranolol for anxiety two days per week when she donated plasma, and stated the propranolol was working well (B15F/6). Follow up records are generally consistent, noting the claimant presented with anxious/fearful thoughts, but denied difficulty falling or staying asleep, and exam findings noted appropriate mood and affect (B15F/1-4).

In May 2019 when she presented with her infant in a carrier for a medication follow up, she reported doing well overall with prescribed medications including Latuda, Depakote, and Buspirone, and stated the propranolol was working well when taken just before plasma donations (B15F/1). At a counseling follow up in May 2019, notes indicate she appeared with less anxious affect, with slowly improving mood; appeared less distracted; was very verbal, present, and engaged; and presented paperwork endorsing the transfer of her psychiatric care to the Nord Center (B16F/33). In June 2019, the claimant followed up with increased anxiety regarding paperwork for Social Security, and records also show her medications were adjusted with the new provider through the Nord Center (B16F/35-38). Progress notes also indicate the claimant reported she would like to be more social, but had not had the time to venture out, and with further discussion it appeared there was a need for added childcare, according to treatment notes (B16F/37). While the claimant appeared at a June 24, 2019 session with mild anxiety related to the completion of paperwork, she was generally stable and was able to be redirected (B16F/37). Additional records from June 2019 include complaints of chronic anxiety symptoms, triggered by crowds and social situations, yet, mental status exam findings remained largely within normal limits (B18F/2-4). On mental status examination, the claimant displayed some racing thoughts, but there was no evidence of abnormal thought content; her associations were intact; memory, insight, and judgment were noted to be fair; and she appeared well-groomed (B18F/2-5).

The treatment records show the claimant continued to follow up with medication management and counseling services through the relevant period (B18F; B19F; B20F; B22F). Medication management appointments noted the claimant expressed some anxiety with less income at home and some frustrations with her son's behaviors, but overall she felt the medications helped her with her mood and anxiety; she denied any major depressive or manic episodes between appointments, and denied any side effects of medications (B22F/17, 21, 25, 29, 37, 41, 50). Mental status exam findings also noted that she appeared with racing thought processes at times, but was also generally well-groomed, with expressive language, clear speech, no abnormal thoughts, intact associations, with fair memory, insight, and judgment (B22F/17-18, 21-22, 25- 26, 33-34, 37-38, 41-42,

50-51).

Treatment records from January 2020 note the claimant reported she continued to work on her anxiety symptoms, and that she has "made improvement" (B22F/1). The records also note the claimant's reported abilities as being "able to stay out of the hospital and to continue functioning non [sic] my meds" (B22F/1). She continued psychotherapy services through the Nord Center in 2020 and 2021 1-3 times per quarter (B22F/1, 7). She continued to report symptoms from anxiety, including sometimes getting overwhelmed with "trying to get everything done" explaining she needed to work on balancing out her day so she does not get overwhelmed (B22F/10). Progress notes from February 2021 indicated the claimant was working on toilet training her 3 ½ year old son, and that she continued to maintain her activities of daily living as well as the household generally (B22F/10, 33). The claimant also reported that she continued to work on ways to cope with her anxiety, better herself, and working with her son to help him be ready for pre-school (B22F/10). Her medications were adjusted during the relevant period as well to account for reports of periods of increased anxiety symptoms, but she remained medication compliant and did not report major issues with depression, mania, or anxiety (B22F/17-53). Overall, while the treatment records note the claimant reported ongoing anxiety symptoms throughout 2021, the notes from December 2021 indicate she reported "doing ok without Depakote" and denied any mood episodes without medication, and she had not yet tried Lamictal due to feeling like she does not need it (B22F/110). She presented with pressure speech and racing thoughts and reported increased anxiety with panic attacks regarding her upcoming dental operation to have all teeth removed (B22F/110-111). Her medications were continued and she was given a prescription for Ativan for her upcoming dental procedure, and buspirone was lowered due to claimant's reports of difficulty taking the larger pill, and no changes were made to other medications (B22F/110-116).

Progress notes from February 2022 indicate the claimant reported only "sometimes" (not often or always) feeling afraid to go out of her home alone; sometimes feeling afraid in open spaces or on the streets; sometimes feeling irritable; sometimes having difficulty controlling her anger; sometimes feeling suspicious of others; and sometimes of having mood swings (B20F/5-6). Additionally at the six-month assessment, the claimant reported that she had made a little progress toward her treatment goals with counseling 2-4 times per month through Pathways Counseling as of February 2022 (B20F/1-6). The treatment notes reflect the claimant reported her abilities included being a full-time mother, and strengths were "being a good mom" among others (B20F/2). In March 2022, the claimant reported increased anxiety, but stable depression symptoms, and she also reported some reoccurring OCD tendencies with checking, counting, and restlessness (B22F/121). She inquired about being started back on Zoloft as it had helped her in the past for her anxiety, and also asked for hydroxyzine back to help with breakthrough anxiety, as well as a refill of Ativan for additional oral surgery for implants (B22F/121). Mental status exam findings from the March 2022

appointment noted she appeared with anxious mood and affect, but appearance, speech, and language were all within normal limits; attention and concentration were within normal limits; thought process and cognition were within normal limits – coherent and goal directed with no evidence of abnormal or delusional thought content or cognitive disturbance; there was no evidence of psychosis or disturbance of perception; fund of knowledge was within normal limits; and she had fair insight and judgment (B22F/124-126). Her medications were adjusted to start Zoloft 50mg daily for anxiety; restart hydroxyzine as needed; refilled lorazepam for second oral surgery; and all other medications were continued without change (B22F/128-129).

(*Id.* at PageID #: 833-37).

## IV.    The ALJ's Decision

The ALJ made the following findings relevant to this appeal:

1. The most recent favorable medical decision finding that the claimant was disabled is the determination dated October 23, 2013. This is known as the "comparison point decision" or CPD.

2. At the time of the CPD, the claimant had the following medically determinable impairments: Affective Disorders and Anxiety Disorders. These impairments were found to meet section 12.04B of 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d) and 416.920(d)).

3. Through the date of this decision, the claimant has not engaged in substantial gainful activity (20 CFR 404.1594(f)(1)).

4. The medical evidence establishes that, since May 14, 2018, the claimant has had the following medically determinable impairments: bipolar disorder and generalized anxiety disorder (GAD). These are the claimant's current impairments.

5. Since May 14, 2018, the claimant has not had an impairment or combination of impairments which meets or medically equals the severity of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525, 404.1526, 416.925 and 416.926).

6. Medical improvement occurred on May 14, 2018 (20 CFR 404.1594(b)(1) and 416.994(b)(1)(i)).

7. The medical improvement is related to the ability to work because, by May 14, 2018, the claimant's CPD impairment(s) no longer met or medically equaled the same listing(s) that was met at the time of the CPD (20 CFR 404.1594(c)(3)(i) and 416.994(b)(2)(iv)(A)).

8. Since May 14, 2018, the claimant has continued to have a severe impairment or combination of impairments (20 CFR 404.1594(f)(6) and 416.994(b)(5)(v)).

9. Since May 14, 2018, based on the current impairments, the claimant has had the residual functional capacity to perform work at all exertional levels, except she can understand, remember, and apply information to complete simple and detailed instructions; can perform duties in a work environment that does not require piece rate type work; can interact with others up to occasionally to engage in work related tasks such as asking questions, gathering information, clarifying instructions, pointing or directing where items may be placed but no arbitration or conflict resolution; and can adapt to routine type changes in the work place setting.

10. Since May 14, 2018, the claimant has been capable of performing past relevant work as a Laundry Worker. This work has not required the performance of work-related activities precluded by the claimant's residual functional capacity based on the impairments present since May 14, 2018 (20 CFR 404.1565 and 416.965).

11. The claimant's disability ended on May 14, 2018, and the claimant has not become disabled again since that date (20 CFR 404.1594(1)(7) and 416.994(b)(5)(vi)).

(ECF No. 7, PageID #: 825, 828, 830-31, 845-47).

## V. Law & Analysis

### A. Standard of Review

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

## B.  Standard for Disability

"When the cessation of benefits is at issue . . . the central question is whether the claimant's medical impairments have improved to the point where she is able to perform substantial gainful activity." *Kennedy v. Astrue*, 247 F. App'x 761, 764 (6th Cir. 2007) (citing 42 U.S.C. § 423(f)(1)).  Pursuant to the regulations:

> Medical improvement is any decrease in the medical severity of impairment(s) present at the time of the most recent favorable medical decision that you were disabled . . . and is determined by a comparison of prior and current medical evidence which must show that there have been changes (improvement) in the symptoms, signs or laboratory findings associated with that impairment(s).

20 C.F.R. § 404.1594(c).

The Social Security regulations outline an eight-step process[1] that the ALJ must use in determining whether a recipient's entitlement to disability benefits has ended:

> (1)  Are you engaging in substantial gainful activity? If you are (and any applicable trial work period has been completed), we will find disability to have ended . . . .
>
> (2)  If you are not, do you have an impairment or combination of impairments which meets or equals the severity of an impairment listed in appendix 1 of this subpart? If you do, your disability will be found to continue.

---

[1] For a Title XVI supplemental security claim, only a seven-step process is used, omitting the first step concerning whether the claimant is engaging in substantial gainful activity.  *See* 20 C.F.R. § 416.994(b)(5).

(3) If you do not, has there been medical improvement as defined in paragraph (b)(1) of this section? If there has been medical improvement as shown by a decrease in medical severity, see step (4). If there has been no decrease in medical severity, there has been no medical improvement. (See step (5).)

(4) If there has been medical improvement, we must determine whether it is related to your ability to do work in accordance with paragraphs (b)(1) through (4) of this section; i.e., whether or not there has been an increase in the residual functional capacity based on the impairment(s) that was present at the time of the most recent favorable medical determination. If medical improvement is not related to your ability to do work, see step (5). If medical improvement is related to your ability to do work, see step (6).

(5) If we found at step (3) that there has been no medical improvement or if we found at step (4) that the medical improvement is not related to your ability to work, we consider whether any of the exceptions in paragraphs (d) and (e) of this section apply. If none of them apply, your disability will be found to continue. If one of the first group of exceptions to medical improvement applies, see step (6). If an exception from the second group of exceptions to medical improvement applies, your disability will be found to have ended. The second group of exceptions to medical improvement may be considered at any point in this process.

(6) If medical improvement is shown to be related to your ability to do work or if one of the first group of exceptions to medical improvement applies, we will determine whether all your current impairments in combination are severe (see § 404.1521). This determination will consider all your current impairments and the impact of the combination of those impairments on your ability to function. If the residual functional capacity assessment in step (4) above shows significant limitation of your ability to do basic work activities, see step (7). When the evidence shows that all your current impairments in combination do not significantly limit your physical or mental abilities to do basic work activities, these impairments will not be considered severe in nature. If so, you will no longer be considered to be disabled.

(7) If your impairment(s) is severe, we will assess your current ability to do substantial gainful activity in accordance with § 404.1560. That is, we will assess your residual functional capacity based on all your current impairments and consider whether you can still do work you have done in the past. If you can do such work, disability will be found to have ended.

(8) If you are not able to do work you have done in the past, we will consider whether you can do other work given the residual functional capacity assessment made under paragraph (f)(7) of this section and your age, education, and past work experience . . . . If you can, we will find that your disability has ended. If you cannot, we will find that your disability continues.

14

20 C.F.R. § 404.1594(f)(1). "[T]he ultimate burden of proof lies with the Commissioner in termination proceedings." *Kennedy*, 247 F. App'x at 764.

## C. Discussion

Claimant raises two issues on appeal: (1) whether the ALJ met her burden of proof to show that medical improvement occurred and (2) whether substantial evidence supports the ALJ's determination of the RFC. (ECF No. 8 at 1).

### 1. Substantial evidence supports the ALJ's conclusion that medical improvement occurred.

In the initial disability determination, Claimant was found to satisfy the criteria of listing 12.04 because she suffered marked limitations in two of the paragraph B criteria. (ECF No. 7, PageID #: 981-82). The current ALJ's decision, however, found that Claimant suffered from only moderate limitations in these areas. (*Id.* at PageID #: 826-27). The ALJ explained her decision:

> In interacting with others, the claimant has moderate limitation. The claimant alleged that she experiences significant social anxiety when around other people, has difficulty interacting with supervisors and coworkers, and does not do well in large crowds or public places such as the grocery store (hearing testimony). The treatment records also include the claimant's reports of experiencing social anxiety, but the records also note that she demonstrated improvement in functioning with medication. Progress notes indicate the claimant reported her medications helped her social anxiety (B9F/7; B14F; B16F; B18F; B20F; B22F). Examination findings also note that she presented with anxious/fearful thoughts, but the same records also noted she had appropriate mood and affect and normal insight and judgment on exam (B15F/1-26; B16F). According to her statements, the claimant is also able to get along with providers, spend time with friends and family, and live with others including her infant child and her long-term boyfriend/fiancé. Finally, the medical evidence shows that the claimant had a good rapport with providers, was described as pleasant and cooperative, and had good interactions with non-medical staff (B4F; B9F; B14F; B16F; B18F; B20F; B22F).
>
> . . .
>
> Finally, the claimant has moderate limitations in her ability to adapt or manage

herself. The claimant asserted that she has difficulties handling change, bathing, managing her mood, and caring for her baby, and reported receiving help from her fiancé, daughter, mother, and mother-in-law when feeling overwhelmed (B6F; B10F; B14F; B16F; B18F; B22F; hearing testimony). That said, the claimant also stated that she is able to handle self-care and personal hygiene with reminders from family, and was able to help care for her children including her infant son during the relevant period (B16F; B18F; B20F; B22F; hearing testimony). Meanwhile, the objective evidence in the record showed the claimant to have appropriate grooming and hygiene, no problem getting along well with providers and staff, and no problems with temper control (B4F; B9F; B14F; B16F; B18F; B20F; B22F).

(*Id.*).

Claimant argues there has not been medical improvement because she continued to have a marked limitation in these two areas and "the ALJ failed in her duty to fully consider the psychological supports and living arrangements that Ms. Buchanan required in order to function when she determined that the claimant's disability ceased." (ECF No. 8 at 14-16, 18). Claimant asserts that the same symptoms that existed in 2013 when she was initially found to be disabled continued to plague her up until the ALJ's decision. (*Id.* at 16). Claimant argues that the ALJ "failed to do the requisite analysis required of her by the Regulations" because she did not "point to any activity that Ms. Buchanan did outside the protection and safety of her home that would support the conclusion that she could work independently, effectively, and appropriately, 8 hours a day, 5 days a week." (*Id.* at 19-20).

The Commissioner responds that substantial evidence supports the ALJ's finding that Claimant had no more than moderate limitations in these areas. (ECF No. 12 at 11-13). As to interacting with others, the Commissioner asserts that the ALJ "referenced mental status examination findings" including "entries showing that Plaintiff displayed a euthymic or normal mood and affect, calm and cooperative attitude, normal thought process and/or normal 'socialization;'" cited to Claimant's own reports that "her social anxiety symptoms improved

with medication;" and  "observed that the record showed Plaintiff often had a good rapport with treatment providers and described various other activities involving social interaction."  (*Id.* at 11-12).  As to adapting and managing oneself, the Commissioner argues "the ALJ referenced reported activities or other evidence that was consistent with no more than moderate limitation in this area," including caring for her young child, shopping for small amounts of groceries, "cleaning, cooking, mopping, doing dishes, and reading on the internet" such that substantial evidence supports the decision.  (*Id.* at 13).  Additionally, the Commissioner argues the ALJ "did in fact recognize, throughout the decision, that Plaintiff received assistance from family members or others" but "the evidence did not establish that Plaintiff required the type of structured environment or support contemplated by the Listings, as evidenced by her ability to engage in several activates on her own."  (*Id.* at 14).  Finally, the Commissioner argues the ALJ "was not required to equate any of the activities described with the ability to work" but rather properly cited Claimant's activities "for the limited purpose of showing that Plaintiff's impairments were not as limiting as alleged."  (*Id.*)

Claimant replies that "there was nothing in the treatment records to suggest that she has the ability to be around others in a work setting" and any reliance on her ability to interact with treatment providers is misplaced because it is not the same as interacting with coworkers.  (ECF No. 13 at 3-4).  She argues substantial evidence does not support the ALJ's decision because "the behaviors that the ALJ enumerated in her current decision to show medical improvement were the same medical findings and behaviors Ms. Buchanan exhibited between 2011 and 2013, the initial period of disability."  (*Id.*at 6).  She further argues "the ALJ had a duty to consider Ms. Buchanan's accommodations and to explain how she considered them in determining whether there was medical improvement to which led to an increase in ability to engage in competitive

employment[, y]et she failed to do so." (*Id.* at 8).  Finally, she argues that "[c]ontrary to the Defendant's position, the ALJ was required to do the analysis and provide an explanation, not only whether there was medical improvement, but whether any such improvement permitted Ms. Buchanan to engage in substantial gainful activity." (*Id.* at 9).

Under the regulations, interact with others "refers to the abilities to relate to and work with supervisors, co-workers, and the public" and examples include asking for help when needed; stating own point of view; and keeping social interactions free of excessive irritability, sensitivity, argumentativeness, or suspiciousness.  20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(E)(2).  In finding Claimant had only a moderate limitation in this area, the ALJ cited medical records indicating that Claimant's bipolar disorder and social anxiety were improved with medication.  (*See* ECF No. 7, PageID #: 654, 659, 729, 733, 1143, 1151, 1155).  The ALJ noted that Claimant testified that she conducted her own research to determine whether her medication was safe to take while pregnant.  (*Id.* at PageID #: 829, 887).  Claimant also chose to transfer her care from one provider to another to be able to receive better care.  (*Id.* at PageID #: 788, 889).  While Claimant is correct that the ALJ cited her ability to get along well with her providers, she also cited Claimant's ability to spend time with family and live with her significant other.  (*Id.* at PageID #: 797).  Claimant indicated a desire to be more social.  (PageID #: 802).  Together, this evidence supports the ALJ's determination that Claimant suffered only a moderate limitation in this area of functioning.

Turning to adapt and manage oneself, the regulations indicate that this area of mental functioning "refers to the abilities to regulate emotions, control behavior and maintain well-being in a work setting."  20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(E)(4)  Specific examples include responding to demands, adapting to changes, and making plans for yourself independently of

others. *Id.* The ALJ noted that "the objective evidence in the record showed the claimant to have appropriate grooming and hygiene." (ECF No. 7, PageID #: 827). The medical records cited indicate that Claimant's general appearance was within normal limits and "neat and clean" at her appointments. (*Id.* at PageID #: 727, 729, 772, 812). There are indications in the record that Claimant "continue[d] to manage her ADL's and the raising of her son and teenage daughter" and brought her son to therapy sessions without assistance. (ECF No. 7, PageID #: 1188, 1190, 1218). With medication, Claimant was able to donate plasma to supplement her income. (PageID #: 1218). All this evidence supports the ALJ's conclusion of only a moderate limitation in this area.

While Claimant argues that the ALJ did not properly consider the support she received, that the same medical conditions existed at her initial disability determination, and whether the medical improvement was related to her ability to work, the Court finds each of these arguments to be without merit. First, the ALJ recognized Claimant's testimony regarding the help she receives from her fiancé, daughter, and mother-in-law, but ultimately found that Claimant was not as limited in her abilities as alleged because the record reflected her ability to be involved in caring for her child, maintaining a committed relationship, and "maintain[ing] a consistent treatment regimen of medication adherence and attending counseling/medical appointments which have resulted in consistent symptom stability over the past five years." (ECF No. 7, PageID #: 837-38). The fact that the record might also support a different conclusion is insufficient to warrant relief because "[e]ven if the record could support an opposite conclusion, [courts] defer to the ALJ's findings because it is supported by substantial evidence, based on the record as a whole." *Nash v. Comm'r of Soc. Sec.*, No. 19-6321, 2020 WL 6882255, at *4 (6th Cir. Aug. 10, 2020). Second, while the same medical conditions existed, the ALJ found that they

were no longer as severe, recognizing that when Claimant was initially found to be disabled, she had "previously been admitted to the hospital for two weeks for psychiatric inpatient care" but, in the time since the previous decision, she "has not required inpatient psychiatric care or had a hospital admission" and had "demonstrated her ability to manage her own healthcare, do research into medications prior to and during her pregnancy, remain medication compliant, care for an infant, assist with household chores, and otherwise live independently since May 2018." (ECF No. 7, PageID #: 830).  Such is sufficient to support that there was a "decrease in the medical severity" of Claimant's impairments as required to find medical improvement.  *See* 20 C.F.R. § 404.1594(c).  Finally, the ALJ found that "[t]he medical improvement is related to the ability to work because by May 14, 2018, the claimant's CPD impairment(s) no longer met or medically equaled the same listing(s) that was met at the time of the CPD."  (ECF No. 7, PageID #: 830).  This finding is in accordance with the regulations, which specifically provide that when a previous decision is based on the fact that a claimant met a listing and "there has been medical improvement to the degree that the requirement of the listing section is no longer met or equaled, then the medical improvement is related to [claimant's] ability to work."   20 C.F.R § 404.1594(c)(3)(i).

Because substantial evidence supports the ALJ's decision that medical improvement occurred, the Court must defer to that decision.

### 2.  Substantial evidence also supports the RFC.

Claimant argues that substantial evidence does not support the RFC because "the ALJ failed to indicate the medical opinions upon which she relied to establish the RFC;" the "agency physicians' opinions cannot serve as the basis for the RFC because they relied on evidence outside the record to which Ms. Buchanan did not have access" and "were based on only half of

the medical evidence in the file;" and "[t]he ALJ also did not discuss the fact that, although she assigned little wight [sic] or somewhat persuasive weight to the other medical opinions, they were all in agreement that Ms. Buchanan could not sustain competitive employment."  (ECF No. 8 at 22).

The Commissioner argues the ALJ was not required to indicate a specific medical opinion she relied on.  (ECF No. 12 at 15).  The Court agrees.  The Sixth Circuit has "previously rejected the argument that a residual functional capacity determination cannot be supported by substantial evidence unless a physician offers an opinion consistent with that of the ALJ." *Mokbel-Aljahmi v. Comm'r of Soc. Sec.*, 732 F. App'x 395, 401 (6th Cir. 2018).  In *Mokbel-Aljahmi*, the ALJ "gave no weight to nearly all the physicians' opinions."  *Id.*  However, because the ALJ "undertook a laborious evaluation of the medical record" when determining the RFC, there was no error.  *Id.*  at 402.  Rather than assigning no weight to each opinion like the ALJ in *Mokbel-Aljahmi*, the ALJ here discussed seven opinions and assigned little to partial weight to each of them in determining Claimant's RFC.  (ECF No. 7, PageID #: 840-45); *see Mitchell v. Comm'r of Soc. Sec.,* No. 1:20-cv-00430, 2021 WL 1146923, at *11 (N.D. Ohio Jan. 15, 2021), *report and recommendation adopted sub nom. Mitchell v. Comm'r of Soc. Sec.*, No. 1:20-cv-00430, 2021 WL 1146358 (N.D. Ohio Mar. 25, 2021) ("When assessing a claimant's RFC, an ALJ 'is not required to recite the medical opinion of a physician verbatim . . . [and] an ALJ does not improperly assume the role of medical expert by assessing the medical and nonmedical evidence before rendering a residual functional capacity finding.").  Additionally, the ALJ conducted an extensive review of the record.  (*Id.* at PageID #: 833-40).  Thus, even if the state agency consultants' opinions were out of date as Claimant argues, the ALJ did not error in crafting the RFC.  *See McGrew v. Comm'r of Soc. Sec.*, 343 F. App'x 26, 32 (6th Cir. 2009)

(ALJ, who relied on state agency physicians' opinions that were allegedly "out of date and did not account for changes in [claimant's] medical condition" did not err in determining the RFC where it was clear from the decision that the ALJ considered additional evidence after the examinations occurred).

Finally, the Court agrees with the Commissioner that because Claimant did "not engage with the ALJ's actual analysis" of the medical opinions, "[h]er mere statement that several opinions show that she is unable to work is thus too insubstantial to be credited, particularly where the decision shows that the ALJ thoroughly addressed these opinions in accordance with the regulations." (ECF No. at 17). "Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones." *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997). Because Claimant did not develop her argument regarding the ALJ's treatment of the medical opinions, the Court deems this argument waived.

## VI. Recommendation

Based on the foregoing, it is RECOMMENDED that the Court OVERRULE Claimant's Statement of Errors and AFFIRM the Commissioner's decision.


Dated: October 10, 2023            s/ *Carmen E. Henderson*
                                        CARMEN E. HENDERSON
                                        U.S. MAGISTRATE JUDGE

---

**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F. 3d 520, 530-31 (6th Cir. 2019).